**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| JEFFERY BATTLE, | * |
| Plaintiff, | * |
| v. | *     Case No.: PWG-14-2250 |
| THOMAS E. PRICE,[1] | * |
| DEPARTMENT OF HEALTH & HUMAN SERVICES, NATIONAL INSTITUTES OF HEALTH, | * |
| | * |
| Defendant. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION AND ORDER

Jeffery Battle, an African American male, initiated this lawsuit against his former employer, the U.S. Department of Health and Human Service's National Institutes of Health (the "Agency"), in 2014. ECF No. 1. He alleged various forms of perceived discrimination and retaliation under Title VII, including events beginning a few months after he amended an Equal Employment Opportunity ("EEO") complaint in October 2011 and continuing throughout a two and a half year period in which Battle continued to file and amend EEO complaints, which led him to believe that the acts were retaliatory. The alleged retaliatory acts included the Agency's failure to select him for a position; its requirement that he participate in procurement activities that Battle believed violated federal regulations, and his supervisor's response to his refusal to participate; and the revocation of his duties as a Team Lead. He also challenged his supervisor's

---

[1] Defendant notes that "Thomas E. Price, M.D., is now the Secretary of the Department of Health and Human Services," such that, "[p]ursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Secretary Price should be substituted for former Secretary Sylvia Mathews Burwell as the defendant in this matter." Def.'s Mot. 1 n.1, ECF No. 93. The Clerk shall change the name on the docket accordingly.

handling of his request for reasonable medical accommodations, insofar as she allegedly did not report the results of an ergonomic study and then sent a report regarding his request that he viewed as "false and deceptive." Additionally, he alleged that the Agency retaliated when his supervisor failed to acknowledge a project he completed and, consequently, gave him a lower performance evaluation for 2012; placed him on a performance improvement plan and then administrative leave with pay; denied him a pay increase; and ultimately terminated his employment. Also, he claimed that charging him with being away without leave and issuing him a Letter of Reprimand were retaliatory acts, as were his supervisor's yelling at him on one occasion and the Director of Contracting sending him a "hostile and threatening" email.

After filing two amendments to his Complaint, Battle's allegations of discrimination based on race, gender and disability; hostile work environment; and retaliation based on the termination of his employment still failed to state a claim, and I dismissed them in response to the Agency's Motion to Dismiss or, in the Alternative, for Summary Judgment, treated as a motion to dismiss. Sept. 19, 2016 Mem. Op. & Order, ECF No. 51. Only his retaliation claim (except insofar as it was based on the termination of his employment) survived the Agency's motion. In concluding that Battle had pleaded a claim for retaliation, I considered the whole picture, in which Battle alleged that he repeatedly took EEO action and then (often within one or two months of that action) repeatedly experienced employment actions that either were adverse in and of themselves or cumulatively would have dissuaded an employee from taking further EEO action. Yet, I ruled that some of the employer's alleged actions were not, on their own, adverse employment actions, and some were not temporally linked to Battle's protected activity. Sept. 19, 2016 Mem. Op. & Order 29.

Now that discovery has concluded, the Agency has moved for summary judgment on what remains of the retaliation claim. ECF No. 93. The parties fully briefed the motion. ECF Nos. 93, 97, 101. A hearing is not necessary. *See* Loc. R. 105.6. Because the undisputed material facts show that the Agency is entitled to judgment as a matter of law, I will grant its motion and close this case.

## **Standard of Review**

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* The Court considers the undisputed facts, and to the extent there is a genuine dispute of material fact, "this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party." *Downing v. Balt. City Bd. of Sch. Comm'rs*, No. RDB-12-1047, 2015 WL 1186430, at *1 (D. Md. Mar. 13, 2015) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

## Discussion

Title VII "prohibits an employer from taking an adverse employment action against any employee 'because he has opposed any practice made an unlawful employment practice.'" *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (quoting 42 U.S.C. § 2000e–3(a)). When the record lacks direct evidence of retaliation, as is the case here, the plaintiff may prove that retaliation occurred using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 249–50 (4th Cir. 2015). Under the *McDonnell Douglas* framework, "the plaintiff first must establish a prima facie case" of retaliation. *Id.* at 250. To do so, the plaintiff must prove: "'(1) that []he engaged in a protected activity,' as well as '(2) that h[is] employer took an adverse employment action against h[im],' and '(3) that there was a causal link between the two events.'" *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (quoting *Navy Fed. Credit Union*, 424 F.3d at 405–06).

Then, if the plaintiff has established a *prima facie* case, "the burden shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster*, 787 F.3d at 250. The employer's "burden is one of production, not persuasion." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Finally, "[i]f the employer sets forth a legitimate, non-retaliatory explanation for the action, the plaintiff then must show the employer's proffered reasons are pretextual or his claim will fail." *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004), *abrogated on other grounds by Foster*, 787 F.3d 243. That is, he "must establish 'both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct.'" *Foster*, 787 F.3d at 252 (quoting *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)).

Thus, "[i]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination [or retaliation]." *Reeves*, 530 U.S. at 147 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)). Even so, "a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability," given that "once the employer's justification has been eliminated, [retaliation] may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* at 147, 149. But,

> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory [or retaliatory]. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Id.* at 148.

I will consider each of the allegedly retaliatory actions that Battle identifies in turn.

### 1. Failure to Select Battle for Director of Contracting Position

Battle unsuccessfully applied for the Director of Contracting position. Instead, an applicant named Sharon Bruce was selected, which Battle claims was an adverse employment action taken in retaliation for his protected activity. Second Am. Compl. ¶ 13, ECF No. 32. Without challenging whether Battle can demonstrate a *prima facie* case, the Agency asserts that it had a "legitimate, non-retaliatory reason for not selecting Plaintiff for the Director of Contracting position"; it did not select him because "he was not the best qualified." Def.'s Mem. 14. Thus, Battle must show pretext. *See Foster*, 787 F.3d at 252; *Price*, 380 F.3d at 212. To demonstrate pretext in an employer's reason for not selecting a candidate for a position, a

plaintiff must "either '… show[] that he was better qualified, or … amass[] circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons.'" *Popoli v. Bd. of Trs. of Harford Cmty. Coll.*, No. JFM-16-00452, 2017 WL 4457153, at *3 (D. Md. Oct. 4, 2017) (quoting *Heiko v. Colombo Sav. Bank, F.S.B.,* 434 F.3d 249, 259 (4th Cir. 2006)). Battle attempts both to show that he was better qualified and to show that the Agency's reasons for selecting Bruce were not credible.

Notably, under the first approach, the burden is on Battle to "show[] that [his] qualifications were so plainly superior that the employer *could not have* preferred another candidate." *Id.* (quoting *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 648 n.4 (4th Cir. 2002)) (emphasis added); *see Featherson v. Montgomery Cty. Pub. Sch.,* 739 F. Supp. 1021, 1028 (D. Md. 1990). Therefore, the Agency need not "objectively prove the person hired was more qualified than the plaintiff," as the Court is not a "super-personnel department" and does not "determin[e] whether [an employer's] perception of an employee's qualifications is erroneous." *Popoli*, 2017 WL 4457153, at *3 (quoting *Evans v. Techs. Applications & Servs. Co.,* 875 F. Supp. 1115, 1120 (D. Md. 1995), *aff'd sub nom. Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954 (4th Cir. 1996)). Also, "[w]here the employer has identified multiple reasons for preferring one candidate over another, the employee cannot prove pretext by carving out a subset of reasons and then comparing himself against that subset." *Camacho v. Colvin*, No. JKB-13-1303, 2015 WL 5439032, at *6 (D. Md. Sept. 15, 2015); *see also Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006) ("[I]n a suit alleging failure to promote, a plaintiff seeking to rebut an employer's reliance on inferior job qualifications cannot simply compare herself to other employees on the basis of a single evaluative factor artificially severed from the

employer's focus on multiple factors in combination."). And, "the plaintiff's perceptions of his own qualifications are irrelevant." *Popoli*, 2017 WL 4457153, at *3.

As for what qualifications are relevant, the Court considers "the criteria the employer deemed relevant to the position in question." *Id.*; *see also Heiko*, 434 F.3d at 259. Here, the job announcement listed the relevant qualifications as:

> Completion of all mandatory training prescribed by the head of the agency for progression to GS-13 or higher level contracting positions, including at least 4-years experience in contracting or related positions.
>
> A 4-year course of study leading to a bachelor's degree, that included or was supplemented by at least 24 semester hours in any combination of the following fields: accounting, business, finance, law, contacts [sic], purchasing, economics, industrial management, marketing, quantitative methods, or organization and management.
>
> . . .
>
> [O]ne year of specialized experience and/or educational requirements listed below for each grade level you are applying for.
>
> You must demonstrate in your resume at least one (1) year of qualifying experience equivalent to at least the GS-14 level in the Federal Government. **Examples of qualifying experience include: supervisory/leadership experience as, or similar to that of, a Section Head or Team Leader; ability to sell ideas, to persuade audiences and to deal effectively with resistance to proposed plans and ideas (remaining open and giving adequate consideration to alternative plans and ideas); with demonstrating a mastery knowledge sufficient to provide technical pre-solicitation, solicitation, proposal evaluation, negotiation, award post-award administration and close-out; and experience communicating effectively and efficiently, both orally and in writing.**
>
> **Also, experience in processes related to procurement of real estate, architecture and engineering, construction, facilities operations and/or maintenance**.

Job Announcement, Jt. Rec. 1109.

Battle does not dispute that Bruce met the training requirements and had experience in contracting. *See* Pl.'s Am. Opp'n 6–7; Dep't of Defense Acquisition Corps – Certif. of Admission, Jt. Rec. 1165 (noting that Bruce was "employed in a position at the grade of GS/GM-

13 or above"; had a bachelor's degree; had "24 semester hours (or the equivalent) of study from an accredited institution of higher education from . . . accounting, business finance, law, contracts, purchasing, economics, industrial management, marketing, quantitative methods, and[/or] organization and management"; and had "four years' experience in an acquisition position . . . or in a compatible position"). And, Battle acknowledges that, in an affidavit submitted with regard to one of his EEO complaints, his former supervisor, Daniel Wheeland (who was on the interview panel for the Director of Contracting position), stated that Battle "did well" in his interview but the interview panel "selected another candidate because there was a consensus that the selected candidate was the best qualified applicant." Wheeland Aff. for EEO Compl., Jt. Rec. 921.

According to Wheeland, "although [Battle] demonstrated strong qualifications, the selected applicant had stronger experience as a manager and in the administration of design and construction contracts." *Id.* Battle argues that the Court should discredit this evidence because it is unsupported and other evidence is, in his view, to the contrary. Pl.'s Am. Opp'n 6–7. Weaving together his arguments of his superior qualifications and the lack of credibility in the Agency's reasons for selecting Bruce, Battle insists that his "qualifications per the selection criteria were superior to Ms. Bruce's qualifications" because, despite Wheeland's "conclusory" assertion, "Ms. Bruce's resume shows absolutely no experience in Architect Engineering and Construction contracts," whereas "Mr. Battle does have design and construction experience as a supervisor and has developed multiple construction services procurement awards while employed at NIH" and he "included his experience in 'Architect – Engineering and Construction' in his resume." *Id.* The Agency views the evidence differently, insisting that "Mr. Wheeland's own testimony," along with "Ms. Bruce's résumé, college transcripts, and training

and certification documentation . . . substantiate Ms. Bruce's exemplary qualifications for the position."  Def.'s Reply 2.

On the record before the Court, which includes all of the evidence the Agency cites, Battle has not shown that he was "so plainly superior that the employer could not have preferred [Bruce]."  *Popoli*, 2017 WL 4457153, at *3.  In his Request to Appoint Sharon Bruce to Fill the Position of Supervisory Contract Specialist ("Request to Appoint Bruce"), Jt. Rec. 2497–2500, Wheeland stated that the interview panel for the position "concluded that Ms. Sharon Bruce possessed the knowledge, skills and abilities required to provide leadership, management and oversight of all acquisition contracting programs for ORF; and it was the consensus of all members of the selection panel that Ms. Bruce was the most qualified candidate."  *Id*. at 2498.  As for her qualifications, he said:

> Ms. Bruce is a career Contract Specialist with a Bachelor's Degree with a Major in Business Administration and a Minor in Human Resource Management. She has a Master's in Business Administration (MBA) from Strayer University, having majored in Acquisition.  Ms. Bruce had a career involving increasing responsibilities as a Contract specialist and eventually leading other Contract Specialists.  Of all candidates, she had the best combination of relevant acquisition experience, leadership experience and management acumen.  . . .

> Ms. Bruce had more knowledge than other applicants in the area of Architect-Engineering and Construction contracts.  As these are the types of contracts that set apart the ORF Consolidated Operations Acquisitions Center (COAC) [to which she was applying] from the others, the selection panel felt that the ideal candidate should have experience in these areas in order to be effective in leading this COAC to heightened states of mission accomplishment, compliance and overall professionalism.  Although she has most recently been working in the area of Information Technology project acquisition, her design and construction experience is relevant and provided her sufficient competencies to either know the answers or to know where to obtain them.

> . . .

> . . . Ms. Bruce worked for the U.S. Army Corps of Engineers where she served as the Chief of the Civil Contracting Branch.  She was responsible for managing and overseeing the acquisition and procurement activities on a daily basis.  Ms. Bruce provided guidance and mentored a team of seven; and successfully lead the team in awarding several contracts exceeding $32 million.

*Id.* at 2499.

It is true that Ms. Bruce's resume does not mention design, engineering, and construction work in particular, but it does state that she worked as Chief of the Civil Contracting Branch of the U.S. Army Corps of Engineers, Bruce Resume, Jt. Rec. 1155, which is a federal agency that provides engineering services, including design, construction, and maintenance, *see* http://www.usace.army.mil/About.aspx; *see also* Fed. R. Evid. 201(b)(2) (the Court may judicially notice facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). In the interview, the candidates were asked to speak about their "background and experience as they relate to this position," which gave her the opportunity to elaborate on this experience. *See* Wheeland Aff. for EEO Compl., Jt. Rec. 922. Wheeland stated that Bruce's "answers to the questions were higher in quality than the other candidates." *Id.* at 921. And, her paperwork and interview responses led the panel to conclude that her "design and construction experience . . . provided her sufficient competencies to either know the answers or to know where to obtain them." Request to Appoint Bruce, Jt. Rec. 2499. Therefore, the Agency's stated reason for selecting Bruce, based on both her management experience and her experience with design and construction contracts, is credible, and Battle has not shown otherwise.

Moreover, the qualifications required "specialized experience and/**_or_** educational requirements." Job Announcement, Jt. Rec. 1109 (emphasis added). Bruce's resume stated that, in October 2009, she completed a course in "Architect-Engineer Contracting." Bruce Resume, Jt. Rec. 1157. Further, given that the Agency gave more than one reason for preferring Bruce, and Battle has not shown that either reason was not credible so as to prove pretext based on Wheeland's statements as circumstantial evidence undermining the Agency's credibility, Battle

cannot rely only on Bruce's experience in design and construction contracts relative to his own, while ignoring Bruce's management skills. *See Hux*, 451 F.3d at 315; *Camacho*, 2015 WL 5439032, at *6.

As for Battle's insistence that he clearly was the better candidate, it is true that Battle's "Summary Rating" as a Contract Officer in 2009 was "Exceptional" (the highest category), and for 2010 and 2011, his "Summary Rating" in a supervisory role was "Fully Successful" (the second highest of four categories). Performance Plans, Jt. Rec. 264, 309, 2112. Also, his rating in "Design & Construction Management Process Refinement" in 2010 was "Fully Successful." *Id.* at 315. And, he had experience "supervis[ing], direct[ing] and coordinat[ing] the [National Institutes of Health's] Contracting Officer's daily contract activities, [and] approv[ing] and assign[ing] work." Battle Resume, Jt. Rec. 1128. Additionally, he was "Skilled in Architect-Engineering and Construction," and had received training in that area. *Id.* at 1128, 1132.

But, these achievements do not show that the Agency could not have preferred Bruce based on her qualifications, given the strength of her qualifications as described above and in further detail in her lengthy resume and previous evaluations. *See* Bruce Resume, 1154–59, 1166–69. Consequently, Battle has not demonstrated pretext by either means, and the Agency is entitled to summary judgment on Battle's retaliation claim insofar as it is based on his non-selection for the Director of Contracting position. *See Heiko*, 434 F.3d at 259–61 (concluding that, where plaintiff showed that he "had comparatively greater [relevant] experience" and higher performance evaluations, that the chosen candidate was "comparative[ly] unfamiliar[] with the computer programs critical to th[e] department," and that he "was on the rise" at the company, previously receiving one promotion after another, "the plaintiff ha[d] made a strong showing that his qualifications [we]re demonstrably superior" and thereby "provided sufficient evidence that

the employer's explanation may be pretext for discrimination"); *Dennis*, 290 F.3d at 648 n.4; *Popoli*, 2017 WL 4457153, at *3.

2. *Actions Regarding Building 10 Loading Docks Contract*

**a. Request to sign**

Battle alleges that the Agency retaliated again him with regard to how it handled a contract "for the Operation and Maintenance of Building 10 Loading Docks, for the National Institutes of Health" (the "Contract"). Battle Supp. Aff. for EEO Compl., Jt. Rec. 395; Second Am. Compl. ¶ 14. Specifically, in Fall 2011, Christine Carter-Kurant, who was Branch Chief at the time, "asked [Battle] to sign [the] contract," even though he "did not develop" the Contract. Battle Dep. 26:5–14, 30:4–5, Jt. Rec. 2443, 2444; *see* Contract, Jt. Rec. 657–604 (listing Battle as Contracting Officer; unsigned). The parties agree that it was Carter-Kurant who developed the Contract and that she was not a federal employee at the time she developed it. Pl.'s Am. Opp'n 10–11; Rice Second Supp. Aff. for EEO Compl., Jt. Rec. 821; *see* Emails (email from Richard Wells (who is listed as Contracting Officer's Technical Representative on contract) stating that Carter-Kurant "oversaw th[e] process" of "develop[ing] the Technical Evaluation Report" for the "Loading Dock" Contract).

Battle contends, without support, that he "was NOT the Contracting Officer of record here," that Carter-Kurant was not authorized to develop the contract, and that she "had affixed Mr. Battle's name to the contract . . . without authorization." Pl.'s Am. Opp'n 10–12. In contrast, the Agency relies on a sworn statement from Pat Rice, who was the Acting Director of Contracting at the time, and who stated that Ms. Anazette Andrews originally was "assigned . . . as the Contracting Officer" for the Contract but, because "she did not have the warrant capacity to execute the action" (that is, sign the Contract), Rice "called [Battle] into [his] office and

informed him that given the potential dollar amount of the action, that he was to be the Contracting Officer as he has unlimited warrant authority." Rice Second Supp. Aff. for EEO Compl., Jt. Rec. 821. Additionally, Rice stated that "Ms. Carter-Kurant had worked on this contract when she was a Contract Specialist Contractor . . . along with another Contract Specialist contractor, Mr. Eugene Garrett," and "it is normal business practice for a Contract Specialist and/or Contract-Specialist Contractor to work on developing contract requirements." *Id.* Battle does not offer even a scintilla of evidence to the contrary. Thus, the unrebutted evidence shows that not only was Carter-Kurant's role in developing the Contract proper, but also it was proper to ask Battle, as the Contracting Officer, to sign the contract. *See id.*

According to Battle, the request that he sign the Contract was an adverse employment action because, "[i]f [he] signed a contract [he] did not develop [he] could lose [his] warrant and get fired," Battle Dep. 27:4–5, Jt. Rec. 2443, whereas "[i]f he did not sign the improper contract he would be accused of not doing his job and or not following his supervisor's directives," which he insists "is exactly what happened," Pl.'s Am. Opp'n 11. Battle asserts that Carter-Kurant "*could* [have] cite[d] him for failure to perform his job if he didn't sign." *Id.* at 14 (emphasis added). But, significantly, Battle does not offer any evidence that the Agency treated his failure to sign the Contract as a failure to perform his job satisfactorily. Moreover, the Agency provided unrebutted evidence, in the form of Rice's sworn statement, that, when Carter-Kurant asked Battle "to review and execute the contract" and Battle "became defensive and stated he had no knowledge of the contract in general as he was not involved with the writing and solicitation process," Carter-Kurant found someone else to review and sign the Contract. *Id*. at 822. Thus, even if it would have been improper for Battle to have signed the Contract, given that Battle has not offered any evidence of adverse ramifications—or even threat of such consequences—for his

refusal to sign the Contract, he cannot establish that such a request to sign a Contract would dissuade a reasonable worker from making a complaint against an employer. *See Burlington N.*, 548 U.S. at 68. Consequently, this action on its own is not an adverse employment action. *See id.* And, even in conjunction with the other alleged actions, a reasonable factfinder could not conclude that a request with no threat of negative results would tend to discourage a reasonable employee from filing a complaint. Accordingly, the Agency is entitled to summary judgment on Battle's retaliation claim to the extent that it is based on the request that he sign the contract. *See Smith v. Vilsack*, 832 F. Supp. 2d 573, 585–86 (D. Md. 2011).

### b. Response to Refusal to Sign

Battle also alleges that, in response to his refusal to sign the Contract, Carter-Kurant "began screaming and yelling at him, and assaulted him by swinging a large and dense contract file, about 4" inches thick with the consistency of a large brick, in Mr. Battle's face, close enough to injure his face and eyes . . . ." Pl.'s Am. Opp'n 10; *see* Second Am. Compl. ¶ 14. The Agency asserts that he failed to raise the alleged physical assault before the EEOC and therefore failed to exhaust the claim. *See* Def.'s Mem. 16. And, it contends that Battle does not respond to this argument, *see* Def.'s Reply 5 n.5, but that is not true: Battle counters that he did exhaust the claim, noting that "[i]n his deposition during the EEO process," he testified about the file's proximity to his face. Pl.'s Am. Opp'n 15 n.5.

In a Title VII action, a plaintiff may bring "[o]nly those . . . claims stated in the initial charge, those reasonably related to the original [EEOC] complaint, and those developed by reasonable investigation of the original complaint." *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996)). Notably, "[t]he Fourth Circuit has 'found exhaustion where . . . both the EEOC

charge and the complaint included claims of retaliation by the same actor, but involved different retaliatory conduct.' " *Thoopsamoot v. Reg'l Servs. Ctr.*, No. PWG-13-1663, 2014 WL 1120239, at *6 (D. Md. Mar. 19, 2014) (quoting *Sydnor v. Fairfax Cty., Va.*, 681 F.3d 591, 594 (4th Cir. 2012)). In *Thoopsamoot*, the plaintiff's EEOC charge identified three discriminatory acts as bases for her discrimination and retaliation claims, and then before this Court the plaintiff alleged additional discriminatory acts as bases for her discrimination and retaliation claims. *Id.* This Court concluded that the plaintiff's "new claims of discrimination and retaliation," which "involve[d] " 'the same actor, but . . . different . . . conduct,' . . . reasonably follow[ed] from the facts alleged in Plaintiff's EEOC complaint." *Id.* (quoting *Sydnor,* 681 F.3d at 594).

Here, Battle raised the issue of Carter-Kurant yelling at him before the EEOC when he complained about her request that he sign the purportedly improper Contract. *See* Battle Supp. Aff. for EEO Compl, Jt. Rec. 395–97. Battle's allegation that Carter-Kurant also shook a large binder at him involves the same actor, is "reasonably related to the original [EEOC] complaint," and could be "developed by reasonable investigation of the original complaint." *See Jones*, 551 F.3d at 300. Therefore, Battle exhausted his administrative remedies for this claim. *See id.*; *see also Sydnor,* 681 F.3d at 594; *Evans*, 80 F.3d at 963; *Thoopsamoot*, 2014 WL 1120239, at *6.

Nonetheless, what Battle clearly alleges—and what the facts viewed in the light most favorable to Battle show—is that Carter-Kurant's alleged verbal and physical assault was *in response to Battle's refusal to sign the Contract. See* Second Am. Compl. ¶ 14 ("Mr. Battle refused to sign the unauthorized contract, and Christine Carter-Kurant began screaming and yelling at him, and swung a large and dense contract file, about 4" inches thick with the constancy of a large brick, in Mr. Battle's face, close enough to cause injury to his face and eyes."); Battle Dep. 30:15–31:15, Jt. Rec. 2444 (stating that the assault "happen[ed] in

connection with [his] refusal to sign the contract" and that, after he refused to sign, he "asked [Eugene] Garrett to watch Ms. [Carter-Kurant] to see what she would do because [he] knew she would be angry that [he] would not sign this contract," so he "asked [Garrett] to watch her to see what she would do"). Consequently, Carter-Kurant's alleged assault was causally linked to his refusal to sign.

While Battle may have believed that he was opposing an unlawful activity by refusing to sign the Contract, he does not allege that he believed (nor could he have reasonably believed) that asking him to sign the Contract was "unlawful *pursuant to Title VII*," which only protects against discrimination. *See Olekanma v. Wolfe*, No. DKC 15-0984, 2017 WL 4222630, at *6 (D. Md. Sept. 22, 2017) (noting that, for a Title VII retaliation claim, "the actions complained about need to be actions made unlawful *pursuant to Title VII*" (emphasis added) (citing *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (en banc)); *see also Perry v. Maryland*, No. MJG-17-3619, 2018 WL 1183656, at *5 (D. Md. Mar. 7, 2018) ("Section 704(a) of Title VII provides that an employee engages in protected activity when she 'oppose[s] any practice *made an unlawful employment practice by this subchapter*' or 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' 42 U.S.C. § 2000e–3(a). . . . To decide whether a plaintiff has engaged in a protected activity, courts must first consider 'whether the employee "communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination."' *Bowman v. Balt. City Bd. of Sch. Comm'rs*, 173 F. Supp. 3d 242, 248 (D. Md. 2016)." (emphasis added)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005) ("[P]rotected oppositional activities may include 'staging informal protests and voicing one's own opinions in order to bring attention to an employer's *discriminatory* activities,' [*Laughlin v.*

*Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)], as well as 'complain[ts] . . . about suspected violations,' *Bryant v. Aiken Reg'l Med. Ctrs., Inc.,* 333 F.3d 536, 543–44 (4th Cir. 2003)." (emphasis added)).  Thus, what Battle has shown is that the alleged assault was causally linked to something *other* than protected activity.  Therefore, he cannot prevail on his retaliation claim insofar as it is based on the alleged assault.  *See Boyer–Liberto*, 786 F.3d at 281.

### 3. Revocation of Team Lead Duties

Battle claims that the Agency retaliated against him by revoking his Team Lead duties. Second Am. Compl. ¶ 21.  Because there was no temporal proximity between this and any of Battle's protected activities, Battle cannot establish a *prima facie* case of retaliation based on this action alone.  *See* Sept. 19, 2016 Mem. Op. & Order 29.  At most, this action could be part of a series of actions that would have dissuaded an employee from taking further EEO action, if the Agency does not have a legitimate, non-discriminatory reason for it, or if Battle can show that the proffered reason is pretextual.  *See id.*

The Agency argues that "Ms. Bruce had legitimate, non-retaliatory reasons for relieving Plaintiff of his team lead duties: Plaintiff's performance was woefully deficient and Plaintiff agreed with the decision."  Def.'s Mem. 16.  In support, the Agency relies on an affidavit that Bruce provided to the EEOC and a memorandum that she wrote to Battle when she reinstated his Team Lead duties six months later.  *See id.* at 17 (citing Bruce Aff. for EEO Compl., Jt. Rec. 1810, 1815; Bruce Mem. to Battle, Jt. Rec. 2102).  In her affidavit, Bruce described Battle's "inability to do his job," stating that, at his January 2012 performance appraisal for 2011, she "told him that [she] was very concerned about his performance and that he was not meeting the standards for getting things done on time.  [She] was concerned that he was not going to be able to bring his performance up and continue in a satisfactory manner."  Bruce Aff. for EEO Compl.,

Jt. Rec. 1810; *see also id.* at 1815 (noting that Battle "was struggling with his current performance just doing routine contracting assignments"). Six months after the performance appraisal, in her memorandum to Battle, Bruce stated that, "[d]uring the closeout of [his] 2011 rating," Battle had "acknowledged that [he was] having difficulty completing [his] work." Bruce Mem. to Battle, Jt. Rec. 2102.

In January 2012, Bruce only had worked with Battle for three months, and she noted that "there [was] a difference between the tasks performed by the Team Lead and tasks outlined in his position description." Bruce Aff. for EEO Compl., Jt. Rec. 1810; *see also id.* at 1815. Bruce suggested that, "instead of being a Team Lead, he should focus on bringing his performance up." *Id.* at 1810. According to Bruce, Battle "agreed that this was a wonderful idea." *Id.*; *see also id.* at 1815 (stating that Battle and Bruce "made a joint decision to relieve [Battle] of [his] team lead duties"). According to Bruce, "[i]t was an attempt to provide [Battle] time to get himself together and get focused while [Ms. Bruce] figured out the Team Lead positions." *Id.* at 1810.

Then, in the July 2012 memorandum, Bruce stated that, when they met in January with regard to his performance, they "went over [his] Critical Elements and [she] told [him] that [she] was not checking any of the Leader boxes as there was confusion on [her] part regarding the distinction between a Lead Contract Specialist and a Team Leader." Bruce Mem. to Battle, Jt. Rec. 2102. Bruce had informed Battle that she "would seek clarification on the matter," and in July, apparently having received that clarification, she amended his performance plan to "reflect appropriate Team Lead duties," even though she still had concerns about his performance. *Id.*

Battle insists that "Ms. Bruce was not telling the truth" and that he "never agreed to be removed from his duties as Team Leader." Pl.'s Am. Opp'n 16, 17. In his view,

It belies credibility that someone who "was struggling with his current performance" and "having difficulty completing [his] work" would be able to make such a dramatic turnaround just six months later such that these issues cleared up all together and reinstatement was warranted. It is more likely that the removal was a pretense, and that the stated reasons were a pretextual cover up for defendant's retaliatory intent.

*Id*. at 17. But, Battle, who could have provided an affidavit in support of his recollection of events, does not identify any evidence that supports his assertion that the Agency's reason was false. Thus, he clearly has not provided "sufficient evidence to reject the employer's explanation [and] permit a finding of liability." *See Reeves*, 509 U.S. at 149.

Further, the evidence does not show that Battle was reinstated as a Team Lead because, as he asserts, he "ma[d]e such a dramatic turnaround" in his performance in six months. *See* Pl.'s Am. Opp'n 17. Rather, Bruce reinstated the Team Lead duties as "appropriate" for his position, despite her continued concerns with his performance. *See* Bruce Mem. to Battle, Jt. Rec. 2102; *see also* Bruce Aff. for EEO Compl., Jt. Rec. 1810. And, the evidence is unrebutted that Bruce removed the Team Lead duties to enable Battle to focus on other requirements of his position while she clarified which of the Team Lead duties actually applied. This is a legitimate, non-retaliatory reason, and Battle has failed to show pretext. Therefore, the Agency is entitled to summary judgment on Battle's retaliation claim insofar as it is based on the removal of the Team Lead duties. *See Foster*, 787 F.3d at 252; *Price*, 380 F.3d at 212.

### 4. Failure to Report Results of Ergonomic Study

Battle claims that "his supervisor [did] not report[] the results of his ergonomic study to the NIH Office of Medical Services ['OMS'] and Employee Relations," causing a delay that "result[ed] in his medical condition worsening." Second Am. Compl. ¶ 17; Pl.'s Am. Opp'n 17.[2]

---

[2] The Agency argues that Battle stated during his deposition that "he was no longer asserting that claim." Def.'s Mem. 17. It is true that, in his deposition, Battle stated that he was "guessing"

I already noted that "[t]he failure to report an ergonomic study cannot be viewed as an adverse employment action as it did not affect his employment status," and this action was not temporally proximate to any of Battle's protected activities. Sept. 19, 2016 Mem. Op. & Order 24, 29. Thus, again, this action alone is insufficient to prevail on a retaliation claim, and at most, it could be part of a series of actions that would have dissuaded an employee from taking further EEO action, if the Agency does not have a legitimate, non-discriminatory reason for it, that is not pretextual. *See id.*

The first reason that the Agency provides is that Bruce never received the study, Def.'s Reply 6, but according to Battle, "Ms. Bruce was not telling the truth" when she said that she "never received the results or the evaluation of his ergonomic study," as he "forwarded the results of his ergonomic study to Ms. Bruce" on March 13, 2012, Pl.'s Am. Opp'n 17. The Agency insists that none of the emails that Battle cites included the actual study. Def.'s Reply 7. Not so. A March 13, 2012 email in which Battle wrote: "Ms. Bruce, Ergonomic Study history attached. Thank you, Jeff," included an attachment titled "Ergonomic Study Jeff Battle.pdf." Jt. Rec. 1851.

The Agency contends that, regardless of whether Bruce actually received the study, she had a second "legitimate, non-retaliatory reason for not sending [the study] to OMS: it was up to Plaintiff, not Ms. Bruce, to provide documentation to OMS in support of his request for accommodation." Def.'s Reply 7. The Agency cites a June 12, 2013 affidavit in which Bruce stated that Battle asked to telework and requested reasonable accommodations on November 7, 2011, and Carter-Kurant (his supervisor at the time) "requested additional information" by letter

---

that this claim "was removed from [his] complaint . . by the judge or something." Battle Dep. 42:18 – 43:5, Jt. Rec. 2447. In his Opposition, Battle insists that he "misspoke at deposition and misunderstood whether th[is] claim was previously dismissed." Pl.'s Am. Opp'n 17.

dated November 15, 2011. Bruce Aff. for EEO Compl., Jt. Rec. 1808. Bruce asserted that her own "role was to make sure he got the documentation that Ms. Carter-Kurant asked for and it was his responsibility to submit it forward. It was not supposed to go to [Bruce]. It was to be sent to Occupational Medical Service." *Id.* Battle submitted the documentation to OMS, and OMS reviewed it. *Id.*

Then, on January 9, 2012 Bruce "asked Battle for additional clarifying information." *Id.* Significantly, she wrote to him:

> The review provided by the Occupational Medical Service (OMS) of documentation indicates that you do suffer from a chronic medical condition that episodically limits your ability to sit or stand for long periods and bend forward. It doesn't indicate how often you suffer these limitations, how this condition and your episodic restrictions impact your ability to perform the full range of your duties or how your requested accommodation of telework would assist you in being able to perform the job and/or address your limitations or restrictions.
>
> *I am giving you an opportunity to provide additional clarifying medical information to the OMS* which addresses the specific issues above. I am also specifically interested in understanding if assistive devices such as a chair, height adjustable desk, a sit/stand computer workstation, in addition to leave, when needed, would address your needs . . . .
>
> When providing additional medical information, it should be dated on your medical provider's letterhead or stationery and contain his/her original signature. *OMS will examine the documentation and provide management with a review.*
>
> You failed to follow Ms. Carter-Kurant's instructions regarding the ergonomic assessment and you did not contact the Agency's Industrial Hygienist [to schedule an ergonomic assessment]. As such, I am scheduling an assessment for you. I will notify you of the time and date of such. *The Industrial Hygienist will also provide management with a review of the ergonomic assessment.*

Jan. 9, 2012 Ltr. to Battle, Jt. Rec. 1844 (emphasis added); *see also* Bruce Aff. for EEO Compl., Jt. Rec. 1809 ("[M]y letter[] directed him to submit [the paperwork] to the Occupational Medical Services."). Based on this unrebutted evidence, it clearly was Battle's—not Bruce's—responsibility to provide the additional information, including the ergonomic study, to OMS. *See* Jan. 9, 2012 Ltr. to Battle, Jt. Rec. 1844; Bruce Aff. for EEO Compl., Jt. Rec. 1809.

Consequently, Bruce had a legitimate, non-retaliatory reason for not forwarding the study to OMS, and Battle has not shown that her reason was pretextual. Accordingly, the Agency is entitled to summary judgment on Battle's retaliation claim to the extent that it is based on the failure to forward the ergonomic study. *See Foster*, 787 F.3d at 252; *Price*, 380 F.3d at 212.

### 5. *False and Deceptive Report*

Battle claims that, on April 12, 2013, his "supervisor developed a false and deceptive report that was forwarded to the Office of Medical Services regarding his request for a reasonable medical accommodation." Second Am. Compl. ¶ 20; *see* Pl.'s Am. Opp'n 18. The Agency initially argued that it is entitled to summary judgment on this claim because "there is no evidence that any such 'false and deceptive report' exists." Def.'s Mem. 18. According to the Agency, Battle testified at his deposition "that he was blind copied on an e-mail from [his supervisor Robin] Shafer to the . . . OPM[] in which Ms. Shafer provided false and deceptive information to be included in OPM's memorandum to the OMS regarding Plaintiff's request for reasonable accommodations," but he "could not recall what was 'false or deceptive' about the information without having the document in front of him," and the document was not available at the deposition. *Id.* Then, when the Agency asked Battle to produce it, Plaintiff's counsel stated that he "ha[d] not located the false and deceptive report that was forwarded to the Office of Medical Services." *Id.* Battle counters that he had testified that the letter was "referenced in [his] discovery," and he now states that "[t]he deceptive letter in question was submitted to the Defendant in the response to Request for Documents, during discovery." Pl.'s Am. Opp'n 19 n.6 (citing Battle Dep. 53:21, Jt. Rec. 2449; Pl.'s Disc. Resp., Jt. Rec. 2506–07).

It is true that, at his deposition, Battle testified that he could not "recall without having the document in front of [him] that was forwarded," and that the document was "referenced in

[his] discovery," and Defense counsel "ask[ed] that [he] either direct [her] by Bates number or, if it hasn't been produced, produce a copy of this memo." Battle Dep. 52:13 – 57:21, Jt. Rec. 2449–50. Battle did neither. But, he did testify that the Agency was "trying to lead a doctor into taking their position that [his] reasonable accommodation was a *need* and not a *want* according to what they were not reporting within the language," *Id*. at 56:16–24, Jt. Rec. 2450 (emphasis added). According to Battle, if he "needed" the accommodation, as opposed to simply wanting it, he "could be fired." *Id*. at 58:2–3, Jt. Rec. 2451. He insists that he did not *need* to telework; his request to telework "was just a general request because telework was being offered to everybody else," and he *wanted* to be able to telework also. *Id.* at 58:3–59:3, Jt. Rec. 2451.

In the email he now cites, Heather Defibaugh, an NIH employee and Labor Relations Specialist, wrote to Dr. Schmitt, Director of OMS (*see* Def.'s Reply 8 & n.7), stating "on behalf of management" that "Jeffrey Battle ha[d] renewed his request for Telework as a reasonable accommodation," and explaining that "Management ha[d] been working with Mr. Battle on this accommodation request attempting to determine if there are alternative accommodations, which would allow him to perform the essential duties of his position during his tour of duty." Jt. Rec. 2506. She asked the doctor to "provide insight" as to whether "the medical information submitted [was] sufficient to certify that no assistive devices or other arrangements would be effective in accommodating Mr. Battle" and whether "Telework [was] the only accommodation that w[ould] allow him to perform the essential functions of his position during his tour of duty." *Id.*

Preliminarily, this email correspondence would be more accurately characterized as an inquiry than a report. Moreover, insofar as it reports any information, it is consistent with the unrebutted evidence on the record before me that Battle, even by his own testimony, sought to

telework as a "reasonable accommodation" and his employer wanted to know whether alternative accommodations would suffice. *See* Battle Dep. 58:12–13, Jt. Rec. 2451 ("I was not allowed to telework, so I asked for it under a reasonable accommodation."); Jan. 9, 2012 Ltr. to Battle, Jt. Rec. 1844 ("I am also specifically interested in understanding if assistive devices such as a chair, height adjustable desk, a sit/stand computer workstation, in addition to leave, when needed, would address your needs."). Accordingly, it was sent for legitimate, non-retaliatory reasons, and Battle has not shown pretext. Therefore, the Agency is entitled to summary judgment on Battle's retaliation claim insofar as it is based on this allegedly "false and deceptive" report. *See Foster*, 787 F.3d at 252; *Price*, 380 F.3d at 212.

> 6. *Failure to Acknowledge Project Completion and Consequently Lower Performance Rating, Performance Improvement Plan, Placement on Administrative Leave with Pay, and Denial of Pay Increase*

Battle alleges that his supervisor refused to acknowledge that he completed a project that he was assigned (called a "Justification for Other than Full and Open Competition" ("JOFOC")) and, as a result, gave him a lower 2012 performance rating on January 31, 2013; placed him on a Performance Improvement Plan ("PIP") on April 29, 2013; placed him on administrative leave with pay on August 15, 2013; and denied him a within-grade pay increase on August 23, 2013. Second Am. Compl. ¶¶ 18, 21, 24, 26. Because there was no temporal proximity between the alleged refusal to acknowledge his project completion, the denial of a pay increase, or the placement on administrative leave and any of Battle's protected activities, and placement on a PIP is not an adverse employment action, Battle cannot establish a *prima facie* case of retaliation based on any of these actions alone. *See* Sept. 19, 2016 Mem. Op. & Order 29; *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F.Supp.2d 480, 492 (D. Md. 2013) ("[N]one of the following constitutes an adverse employment action in a retaliation claim: ... issuing a personal

improvement plan . . . ."); *Rice v. Howard Cty. Gov't*, No. ADC-16-3498, 2017 WL 6547994, at *13 (D. Md. Dec. 19, 2017) (same)

The Agency argues that, even if Battle can establish a *prima facie* case of retaliation based on these actions collectively, its legitimate non-retaliatory reason for down-rating his 2012 performance evaluation, placing him on a PIP, denying him a pay increase, and placing him on administrative leave with pay "was that Plaintiff had significantly deficient job performance during 2012 and 2013." Def.'s Mem. 23. As for failing to acknowledge the JOFOC that Battle argues was complete in May 2012, *see* Pl.'s Opp'n 22–23, the Agency contends that it simply was not complete as of May 2012, Def.'s Reply 12–13. Battle insists that, when "Ms. Robin Shafer stated, 'he did not complete the JOFOC in May,[ ]" she "was not telling the truth," and the Agency "used this fabrication as a pretextual reason for downgrading the Plaintiff['s] 2012 final performance." Pl.'s Opp'n 22–23. Likewise, he argues that that the lower performance evaluation was, in turn, pretext for the denial of a within-grade pay increase. *Id*. at 22. According to Battle, "the completed JOFOC" that he "developed and signed" and which has "an initial date of May" appears at Jt. Rec. 1931. *Id.* Certainly, the JOFOC at pages 1931–39 of the Joint Record states that the "Date Received in OAMP" was "05/09/12," but it also includes "Dates of Additional Information 01/15/13" and lists the "Date Resubmitted to OAMP" as "01/21/13." Jt. Rec. 1931. Thus, it is unclear from these entries when the JOFOC was "complete," but the fact that further actions in connection with the JOFOC took place after May, 2012, undermines Battle's contention that it was completed in 2012.

Further, other unrebutted evidence establishes that the JOFOC was not complete in May 2012. In Bruce's June 12, 2013 Affidavit, she stated that Battle "struggle[ed] with doing a justification for the HCA (JOFOC)," and that she "provided him with a copy of [her] notes and

told him to rewrite the justification and give it to [her] . . . so that the document could be sent to the reviewer on Friday, May 25, 2012 . . . ."  Bruce Aff. for EEO Compl., Jt. Rec. 1810.  The version of the JOFOC that she sent to the reviewer on May 25, 2012, which she attached to her Affidavit, was not yet signed.  *Id.*, Jt. Rec. 1872–81.  According to Bruce, "Mr. Battle began the HCA JOFOC in November 2011," and "[t]he type of HCA JOFOC Mr. Battle was working on must be posted to the web within a reasonable amount of time after the issuance of a contract."  *Id.*, Jt. Rec. 1814.  She said that "[t]he contract award date was March 1, 2012," but "[t]he HCA JOFOC was not completed until January 2013" and not posted to the internet until January 31, 2013, eleven months after the contract award date.  *Id.*  And, in a November 20, 2012 email to Battle, Shafer wrote: "Jeff – could you please send me the latest version that you and Mr. Dillon [the reviewer] were on with the JOFOC? . . . I am trying to summarize everything so we can get this completed."  Jt. Rec. 1940.  Moreover, the JOFOC that Battle himself cites is signed by Battle on December 28, 2012 and by others on dates ranging from December 28, 2012 to January 29, 2013.  JOFOC, Jt. Rec. 1938–39.  Clearly, the JOFOC was not complete in May, nor even six months later in November; Battle did not sign it until the end of December 2012, and it was not posted to the internet, as required, until the end of January 2013.

Viewed in the light most favorable to Battle, he may have completed his work on the JOFOC on December 28, 2012, when he signed it.  Even viewing the evidence most favorably to Battle, the Agency did not fail to acknowledge Battle's completion of the JOFOC in May (or any time prior to December 28, 2012), because he had not yet completed it, and Battle's failure to complete the JOFOC in a timely manner was not pretext for giving him a lower performance rating; it was a legitimate, non-retaliatory reason.    Further, Battle's failure to complete the JOFOC, along with his other performance deficiencies discussed previously in Section 3,

Revocation of Team Lead Duties, provided a legitimate, non-retaliatory basis for placing him on a PIP and then administrative leave with pay and for denying him a within-grade pay increase.

As proof of pretext regarding the lower 2012 performance rating and the PIP, Battle also contends that his "supervisors did not follow NIH policy as regards to their actions toward him." Pl.'s Opp'n 21. Specifically, he insists that his supervisors, Bruce and Shafer, "were not the reviewers of Mr. Battle's workloads in 2012 and 2013"; rather, his "subordinates reviewed his work." *Id.* (citing Jt. Ex. 1511). But, according to Bruce, Battle's colleague simply provided "common practice reviews e.g. making sure documents are there, everything is signed and dated," and did not provide "an assessment," whereas Shafer, as his supervisor, "review[ed] his work and his rating was based on her evaluation of his work" and "not based on the[] reviews [provided by his colleagues]." Bruce Supp. Aff. for EEO Compl., Jt. Rec. 1965–66. Indeed, the exhibit Plaintiff cites is the Report of Investigation, in which the investigator noted that Bruce stated that, "while [Battle's] subordinates may have conducted common practice reviews of his work, they are not an evaluation of his work," and that Battle's "performance evaluation was based on Ms. Shafer's evaluation of his work." Report of Investigation, Jt. Rec. 1511 (also noting that Shafer stated that, "consistent with the office's peer review process, [Battle's] subordinates reviewed his work only if he brought it to them and the work was within their warrant level"). Battle does not offer any evidence to the contrary. Thus, the undisputed evidence does not show that his supervisors violated policy in evaluating him.

Battle also insists that, in violation of policy, "he was not placed on a PIP until April 29, 2013, after fully one quarter of the next appraisal year had passed" after he received an "unsatisfactory" 2012 rating," even though "NIH policy guidelines . . . state, 'the employee must first be afforded a reasonable opportunity period, through a Performance Improvement Plan."

Pl.'s Opp'n 21 (citing Jt. Rec. 2421 (HHS.gov Performance Management Appraisal Program)). Yet, the delay in implementation of Battle's PIP did not eliminate the "reasonable opportunity period" Battle claims that he was denied; the Performance Management Appraisal Program that he cites requires that an employee be under a performance plan for at least ninety days before being rated. *See* Performance Mgmt. Appraisal Prog., Jt. Rec. 2421; Defibaugh Aff. for EEO Compl., Jt. Rec. 2017 ("He was placed on a 2013 Performance Management Appraisal Plan when the PIP was issued. An employee only has to be put on a Plan for ninety days to be rated so receiving it in April does not compromise his ability to be rated for the 2013 rating year."). April 29, 2013 was well over ninety days before the end of 2013, and it was over ninety days before Battle was placed on administrative leave on August 15, 2013. Further, the delay here was reasonable and non-retaliatory, as Shafer was getting guidance from Human Resources on how to implement the PIP. Shafer Aff. for EEO Compl., Jt. Rec. 1996 ("I had to work through Human Resources to get the performance plan done. The PIP lays out which parts of his last performance evaluation plan he was not successful on and gives specifics on how to improve. I had to make sure I had addressed his deficiencies appropriately and come up with a plan so that he could improve."); Defibaugh Aff. for EEO Compl., Jt. Rec. 2017 ("The PIP is a comprehensive plan to help the employee improve. These take time to prepare. As such, sometimes the issuance of the PMAP and PIP are delayed. This type of delay is not atypical. Every employee usually has a gap of some sort between their old and new plan."). Consequently, the Agency has shown legitimate, non-retaliatory reasons for its actions and Battle has not shown pretext.

With regard to placement on paid administrative leave, as best I can discern, Battle argues that it is evident that the action was pretextual because he was denied access to email

while on administrative leave.  Pl.'s Opp'n 23 (citing Jt. Rec. 2007, 2009).  While it is true that he was told not to "access his NIH voice mail or any NIH systems . . . (including the NIH email system . . . )," Shafer Supp. Aff. for EEO Compl., Jt. Rec. 2007–08, this instruction was given because "Mr. Battle had been disruptive with personal issues" in emails that he sent, *id.* at 2009.  Moreover, it is unclear how denial of access to email while on administrative leave establishes that the leave itself was pretextual.  Thus, the Agency has demonstrated a legitimate, non-retaliatory reason for placing Battle on paid administrative leave, and Battle has not shown pretext.  Therefore, Battle cannot prevail on his retaliation claim based on the alleged failure to acknowledge his project completion, his lower performance rating, his placement on a PIP, or his placement on paid administrative leave, and the Agency is entitled to judgment as a matter of law.  *See Foster*, 787 F.3d at 252; *Price*, 380 F.3d at 212.

### 7.  *Letter of Reprimand and Absent Without Leave ("AWOL") Designation*

Battle claims that, on March 13, 2013, he was charged with having been absent without leave ("AWOL") for two hours in February 2013 and received a letter of reprimand. Second Am. Compl. ¶ 19.  Neither aspect of this claim constitutes an adverse employment action.  *See Rice v. Howard Cty. Gov't*, No. ADC-16-3498, 2017 WL 6547994, at *13 (D. Md. Dec. 19, 2017) ("[N]one of the following constitutes an adverse employment action in a retaliation claim: . . . considering the employee 'AWOL'; or issuing . . . 'a formal letter of reprimand.'" (quoting *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (quoting *Rock v. McHugh*, 819 F. Supp. 2d 456, 470-71 (D. Md. 2011)))); *Coates v. Vilsack*, No. PWG-12-1787, 2015 WL 1013402, at *6 (D. Md. Mar. 6, 2015) ("[N]either the letter of reprimand nor the letter of proposed suspension is an adverse employment action on its own."); *Muldrow v. Blank*, No. PWG-13-1200, 2014 WL 938475, at *10 (D. Md. Mar. 10, 2014) (noting that neither "'a formal

letter of reprimand,' or 'a proposed termination'" qualifies as "an adverse employment action in a retaliation claim" (quoting *Rock v. McHugh,* 819 F. Supp. 2d 456, 470–71 (D. Md. 2011))). Moreover, the Agency has provided a legitimate, non-retaliatory reason for these actions, and Battle has not shown pretext. Battle was appropriately considered AWOL and reprimanded for leaving work without informing a supervisor because he had, indeed, left work without informing a supervisor; he only had informed Mary Grasson, who reported to him, that "his back was hurting and that he was leaving for the day." Grasson Aff. for EEO Compl., Jt. Rec. 2022–23; Shafer Aff. for EEO Compl., Jt. Rec. 1993; Ltr. of Reprimand, Jt. Rec. 2133. Battle fails to rebut this undisputed evidence to show that the Agency's reason was pretextual. *See* Pl.'s Opp'n 19–20. Accordingly, he cannot prevail on his retaliation claim on these grounds, and the Agency is entitled to judgment as a matter of law.

### 8. *Shouting and Yelling; Hostile Email*

Only two bases for Battle's retaliation claim remain. First, Battle claims that, on July 9, 2013, during a meeting, his supervisor shouted at him and yelled, "Blow me." Second Am. Compl. ¶ 23. Second, Battle claims that, at the conclusion of a sexual harassment investigation, Plaintiff received a "hostile and threatening" e-mail from the Director of Contracting. *Id.* ¶ 22. The shouting and crude language, as well as the email, insofar as he is complaining about the use of abusive language, are not adverse employment actions. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (noting that "the ordinary tribulations of the workplace, such as the sporadic use of abusive language" are insufficient to prove material adversity (quoting *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998))); *Bowen v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. RDB-17-1571, 2018 WL 1784463, at *8 (D. Md. Apr. 12, 2018) (concluding that "being 'screamed and yelled at' by her supervisor" was not an adverse employment action

because it "did not adversely affect the terms, conditions, or benefits of her employment"); *Cepada v. Bd. of Educ. of Balt. Cty.*, 814 F. Supp. 2d 500, 515 (D. Md. 2011) (concluding that "allegations that [plaintiff] was yelled at for complaining about his discriminatory treatment and 'criticized' for contacting his State Delegate are not materially adverse actions"). And, the shouting and the sending of the email, both of which occurred in July 2013, lack temporal proximity to any of Battle's protected activity. *See* Sept. 19, 2016 Mem. Op. & Order 29.

Moreover, taking the email (a July 18, 2013 email from Bruce to Battle) and Battle's deposition testimony in the light most favorable to Battle, a reasonable jury still could not find that the email was hostile or threatening. *See* Email, Jt. Rec. 2494; Battle Dep. 69:23–70:3, Jt. Rec. 2453–54 (identifying this email as the allegedly hostile email). The email stated, in its entirety:

> Jeff,
>
> I have researched the matter that you raised in your email dated July 15, 2013. Based on my inquiries, I have found no merit to your claims. At this time, you will not be moved out of ORF, OA. While you stated that there was a witness or witnesses to this event [the alleged shouting and yelling referenced above], you did not provide name(s). In order for me to do a more comprehensive review of this issue, the name(s) of the individual(s) would be needed. Should you choose to provide the name(s) of the witness(es), please advise and I will look into the matter further.
>
> Secondly, in your email dated July 15, 2013, you raise medical issues such as panic attacks and depression. Given this information, I will be working with Human Resources to request medical documentation from you. Please expect that request in the near future.

Jt. Rec. 2494. Battle testified:

> I perceive[d] the content of this email [as] hostile and threatening according to the entirety of the situation, not just the mere words within this email. The context of what I had reported and the way she came back with I'll be working with human resources to request medical documentation. I had reported that I had been harassed, shouted blow me at, screamed at for a half hour. Sharon Bruce, instead of addressing that issue, she appeared to be turning this back at me in a threatening way.

Battle Dep. 70:11-21, Jt. Rec. 2454. But, Bruce explained that she could not investigate further because Battle would not identify the witness(es) who he claimed overheard the incident; she referred to Human Resources with regard to a separate matter—the medical issues that Battle had raised. Thus, she did not ignore his claims or "turn[] this back at [him]." Moreover, there was nothing that a reasonable jury could find threatening or hostile in the email, even taken in the context in which Battle asks that it be considered. Thus, neither of the remaining bases for retaliation is sufficient on its own for Battle to prevail on his retaliation claim. Nor could a reasonable jury find that the cumulative effect of these two actions forms a pattern of behavior that would dissuade an employee from taking further EEO action. *See Smith v. Vilsack*, 832 F. Supp. 2d 573, 585–86 (D. Md. 2011). In sum, Battle cannot prevail on his retaliation claim on any of the bases he raised. *See id.*; *Foster*, 787 F.3d at 252; *Price*, 380 F.3d at 212. I will grant the Agency's motion.

## ORDER

Accordingly, it is, this 25th day of April, 2018 hereby ORDERED that

1. The Agency's Motion for Summary Judgment, ECF No. 93, IS GRANTED;

2. Judgment IS ENTERED in the Agency's favor on the one remaining claim in this case, for retaliation under Title VII; and

3. The Clerk SHALL CLOSE this case.

_____/S/_____
Paul W. Grimm
United States District Judge